UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISON

| | |
|---|---|
| THE SURGERY CENTER at 900 NORTH MICHIGAN AVENUE, LLC | CIVIL ACTION NO. 1:15-cv-04336 |
| Plaintiff, | |
| v. | Hon. Judge Sharon Johnson Coleman<br>Hon. Jeffrey Cole |
| AMERICAN PHYSICIANS ASSURANCE CORPORATION, INC., AMERICAN PHYSICIANS CAPITAL, INC., | JURY DEMANDED |
| Defendants. | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO COMPEL**

NOW COMES plaintiff, Surgery Center at 900 N. Michigan Ave., LLC, and for its reply in support of its motion to compel defendants American Physicians Assurance Corporation, Inc. and American Physicians Capital, Inc. (collectively referred to as "defendants" or "APAC") to answer certain interrogatories and produce documents, states as follows:

**ARGUMENT**

1. Defendants' response to this motion does nothing more than show their cavalier attitude toward discovery and confirm the recklessness in their discovery processes.[1] What happened in this case is far beyond the typical problems that arise in discovery. Defendants nevertheless suggest that this Court ignore their behavior, including the fact that it took them *seven* months to produce less than 100 internal email chains from the period 2003 to 2010.

2. In a sorry attempt to distract this Court from their egregious discovery conduct, defendants mislead this Court by saying that plaintiff already has the discovery it is seeking. This is not true. Defendants have made similar misrepresentations to plaintiff during discovery.

---

[1] Defendants requested an extension to file their response to this motion (after having plaintiff's brief for over a month) due to an injury. (docket no. 63). Defendants, however, had no problem filing their reply in support of their motion to dismiss plaintiff's amended complaint with Judge Coleman the previous day. (docket no. 65)

1

For example, defendants have consistently represented they did not have a document destruction and retention policy. This was proven to be false when defendants (after months of delay) finally produced their employee handbook, which directly referred to and directed their employees to: "retain and/or destroy documents in accordance with the Document Retention Policy." Defendants, of course, still have not produced a copy of the Document Retention Policy.

3. Defendants also contend plaintiff obtained extensive discovery in the legal malpractice case about the key issues in this case. This is patently false. Defendants were never a party to the legal malpractice case and the key issues in this case are entirely different. Plaintiff did not depose 28 people nor did it obtain "over 43,000 documents" from defendants concerning the issues in this case. The reality is that defendants have produced almost nothing.

4. In their brief, defendants make arguments based on proportionality objections they have waived. In failing to distinguish all but one authority cited by plaintiff in its brief, they also point to outdated cases and erroneously apply admissibility standards rather than the liberal discovery standards. Courts have recognized the potential relevance and discoverability of the information plaintiff is seeking.

## THE MISSING INTERNAL EMAILS

5. Tellingly, on the last page of their brief, defendants boldly say that they have "complied with discovery regarding emails" and that they "have in fact produced all requested emails." Def. Resp. at 13. This is false.

6. The truth is that *seven months* after receiving plaintiff's discovery, defendants still have not produced a *single* internal email from 2003, 2004, 2006, 2008 or 2009. Defendants have produced only one internal email chain from 2005 and two from 2007. Far worse is the fact that defendants have not produced a single internal email from the months of January 2010 and February of 2010—one of the most relevant time periods in the case since that is when after the

appellate remand, defendants' decided *Tate* would go to trial.  Defendants have produced a mere two internal email chains from March 2010, one from April 2010, and less than 100 from May, June, July and August of 2010.  On September 15, 2016 defendants produced 6 internal email chains with a number of redacted pages ("redacted email chains.")  See email from counsel attached as "Exhibit 1" and redacted email chains attached as "Exhibit 2."

7.      On September 20, 2016 defendants finally produced their privilege log.  See privilege log attached as "Exhibit 3."  Instead of listing the bates numbers of the redacted pages as they should have done, defendants used a new prefix "PRIV001" to identify the communications.  See email from defense counsel attached as "Exhibit 4." As a result, it is impossible to match the purported privileged communications identified in the log with the redacted pages from the email chains.  Further, the dates of the privileged communications do not match the dates of the redacted email chains.  For example, the redacted email chains are either dated July 13, 2010 or July 22, 2010.  The privilege log, however, identifies six communications were sent in August 2010.  This does not make sense.

8.      This Court previously warned defendants that any failure to timely file and complete privilege logs would result in a waiver of the privilege.  Docket Entry No. 53; see also Patrick v. City of Chicago, 111 F.Supp.3d 909 (N.D. Ill.2015).  Defendants' privilege log was not only untimely, but it is also improper.  Defendants' objections should therefore be deemed waived.  Alternatively, plaintiff requests that this Court review the redacted emails *in camera* to determine whether the privileged communications identified on the log match the redacted email chains.

## THE MONEY
## INTERROGORY NO. 6

1.      Plaintiff is seeking the amount of money defendants paid to Lowis & Gellen ("L&G") over the seven year period *Tate* was pending.  Plaintiff's theory is that defendants intentionally retained conflicted defense counsel (L&G) knowing it would favor defendants'

3

interests over the interests of the insured. Despite what defendants may say, plaintiff's theory is far from nonsensical:

> Illinois courts recognize that the insurance-defense bar, i.e. lawyers routinely hired by insurance companies to defend insureds, has closer ties to the insurance carrier than to the insured.
>
> As a result, insurance defense lawyers often have a more compelling interest in protecting the insurer's position than that of their client, the insured.

Nandorf Inc. v. CNA Ins. Co., 134 Ill. App. 3d 134, 137. Indeed, "a lawyer who does not look out for the carrier's best interest might soon find himself out of work." San Diego Navy Federal Credit Union v. Cumis Ins. Society, 162 Cal. App. 3d 358 (4th Dist. 1984).

> He who pays the piper calls the tune. The lawyer wants to provide competent defense, yet knows who pays the bills and who is most likely to send new business. This so called tripartite relationship has been well documented as a source of unending ethical, legal and economic tension.

State Farm Mut. Auto. Ins. Co. v. Traver, 980 S.W.2d 625 (1998). Insurance defense counsel often faces "a great temptation to favor [the insurance company] who pays the bills and will send further business…" Traver at 633 (internal citations omitted.)

    2.    The amount of money is highly relevant to a key issue of whether L&G faced this temptation and whether it was a captive law firm. "A captive law firm may take any number of forms, but the key feature is almost total dependence on a limited number of clients." Id,; see also Aviva Abramovsky, The Enterprise Model of Managing Conflicts of Interest in the Tripartite Insurance Defense Relationship, 27 Cardozo L. Rev. 193 (2005)(discussing captive law firms.) Given the information selectively disclosed by L&G (239 cases and $250,000 paid to defend *Tate*), it is reasonable to infer defendants paid L&G at least $59,000,000 between 2003 and 2010. Plaintiff is entitled to an admitted accurate amount.

3.     To support their argument that the money isn't relevant, defendants rely on their own self-serving statements that L&G didn't favor their interests over those of the insured. Plaintiff, however, has alleged numerous breaches of duty committed by L&G.  For example, L&G's failure to advise plaintiff to retain personal counsel.

4.     Defendants contend that L&G's failure to advise plaintiff to retain personal counsel does not matter.  Defendants, however, do not dispute the fact that a conflict existed or even that L&G had a duty to, and never did, advise plaintiff to retain personal counsel.  Instead, they argue personal counsel wouldn't have made a difference because Ms. Griffiths was capable of demanding settlement in *Tate* because she demanded settlement in the *Harris* case.  Wrong.

5.     First, Ms. Griffiths never demanded settlement in the *Harris* case.  Settlement was demanded by personal counsel, attorney Ronald Fleisher.  Second, Mr. Fleisher was retained and demanded that defendants settle the *Harris* case <u>after</u> the excess verdict was rendered in the *Tate* case, not before. Third, what happened with respect to the *Harris* case is exactly what should have happened in the *Tate* case had Ms. Griffiths received the proper advice from L&G before the *Tate* case went to verdict.

6.     In *Harris*, sometime in early 2010, defendants asked Ms. Griffiths for consent to settle, which she gave.  Subsequently, the co-defendants in the *Harris* case began settling out and despite having the consent to settle, defendants refused to offer up the policy.  Having still not offered the policy to *Harris* in May 2010, defendants decided to take the *Tate* case to trial.  The *Tate* excess verdict was rendered on June 8, 2010.  Extremely concerned defendants still had not offered the policy in *Harris*, and having just been hit with a $5.2 million excess verdict in *Tate*, Ms. Griffiths consulted another defense attorney, Ms. Donna Socol.  Ms. Socol advised Ms. Griffiths that if she didn't want another "trainreck" like the *Tate* verdict, she should immediately retain personal counsel to make a demand on defendants to settle the *Harris* case.  Upon receiving the advice she should have received before the *Tate* trial from L&G regarding personal

5

counsel's role, plaintiff retained Mr. Fleisher who then immediately made a demand on defendants to settle the *Harris* case. After receiving a demand from personal counsel to settle the *Harris* case, defendants tendered the policy and settled *Harris* within policy limits.

7. Illinois law required L&G to give full disclosure to the plaintiff concerning all aspects of the representation, including the risk of excess exposure and other foreseeable adverse results. Plaintiff has alleged that the unreasonable oral 90% chance of winning opinion was rendered by L&G to defendants to provide justification for defendants' choice to gamble with plaintiff's assets. See IPI 710.05(3)(5) (bad faith jury instruction allows jury to consider insurance carrier's consideration of, or its failure to properly consider, the advice of counsel.)

8. A conflict of interest existed between plaintiff and defendants. Although both plaintiff and defendants wanted to win at trial, the plaintiff's decision to go to verdict was not informed. Plaintiff was unaware of the conflicts of interest as well as the fact that defendants were gambling with its money. The reason why L&G failed to adequately advise plaintiff was because they wanted to keep defendants' business. "Attorneys who depend on an insurance carrier's referrals for a significant portion of their business income could be said to be at risk of favoring the company over the client in a conflict situation in order to keep the carrier's business." King v. Guillani, 1993 WL 284462 at *6.

9. Defendants also argue the request is not proportional to the needs of the case by assuming disclosure of the name, claim number and amount paid for the 239 claims would lead to ancillary discovery. This is not true. Any ancillary investigation performed would be done by plaintiff on its own, without any additional burden or cost to defendants. Defendants fail to point to any other evidence showing why this request is not proportional to the needs of the case.

6

## THE REMOVAL AND REPLACEMENT OF DEFENSE COUNSEL
## INTERROGATORY NO. 7

10. Defendants contend there is no good faith basis for plaintiff to seek discovery concerning the removal of defense counsel over plaintiff's objection in other cases, and that the information is irrelevant. This information, however, is relevant to show defendants' total control of the defense as evidenced by the removal of the senior attorney from the file, Ms. Lowis, who had evaluated the case as having a value of $10 million and defendants replacing her with Mark Smith, an attorney who gave the opinion of 90% chance of winning before trial.

11. Defendants also contend this discovery "should be refused for the reasons set out concerning interrogatory no. 6." Def. Resp. at 6. Defendants, however, objected to interrogatory no. 6 for proportionality reasons. Defendants never made a proportionality objection to this interrogatory in their written responses. See defendants' interrogatory responses attached as "Exhibit 5." Consequently, defendants have waived any proportionality objection to this interrogatory. See Autotech Tech. Ltd. P'ship v. Automationdirect.com, Inc., 236 F.R.D. 369, 399 (N.D. Ill. 2006).

## PERSONNEL FILES
## DOCUMENT REQUEST NO. 12

12. Defendants infer that plaintiff is *only* seeking the personnel files for information concerning bonus incentives. This is not true. Plaintiff is seeking the personnel files for a variety of relevant information regarding: (i) job descriptions; (ii) annual performance evaluations; (iii) education records; and (iv) goals. See plaintiff's document requests attached as "Exhibit 6." Defendants do not dispute the relevancy of the information plaintiff is seeking.

13. Defendants, instead, accuse plaintiff of failing to disclose to this Court that it already possesses "discovery" showing that APAC had no bonus incentive program. Wrong again. The "discovery" defendants are referring to is information from the *Daniels v. APAC* case.

This information was uncovered by plaintiff, unilaterally, through plaintiff's own investigation.[2] Further, defendants' characterization of the *Daniels* case is misleading. The *Daniels* case was a bad faith failure to settle case and has facts quite similar to this case.

14. In *Daniels*, defendants refused to settle a medical malpractice claim involving a severely disabled plaintiff despite knowing that the case was indefensible. The *Daniels* jury heard evidence that the claims adjusters were given financial targets to pay less in claims to injured patients. Also, adjusters had goals to push many more claims to trial rather than settlement. The jury awarded *Daniels* $3,479,277 in punitive damages. The punitive damage award was the exact amount of a financial target goal that appeared on the Claims Representative Performance Planning & Evaluation Form of Ms. Dana Ashcraft produced by defendants in that case. Ms. Ashcraft also was involved in the handling of the *Tate* claim.

15. Defendants' reliance on Ms. Shutack's self-serving testimony about the bonus incentive program is not enough to thwart plaintiff's request for the relevant information within the personnel files. Nonetheless, Shutack's testimony is contradicted by a memorandum she wrote concerning the promotion of Ashcraft produced in the *Daniels* case. In the memorandum, Shutack recommended Aschraft be promoted as a result of the lower settlement value outcomes on her high exposure files.[3]

16. In a last ditch effort to keep relevant information hidden away, defendants make the conclusory argument that everything in the personnel files is confidential. Defendants, however, offer no evidentiary support for this assertion and fail to identify what specifically contained in the files is confidential. Defendants also ignore the fact that there is a protective order in place and that plaintiff has agreed since March of 2016 to reasonable restrictions on the disclosure and use of any materials that qualify for confidential treatment.

---

[2] The *Daniels* information, although relevant and responsive to many of plaintiff's pending discovery requests, has *never* been produced by defendants in this case.
[3] This memorandum was uncovered by plaintiff during its own investigation, and has never been produced by defendants in this case.

## BAD FAITH LAWSUITS
## <u>INTERROGATORY NO. 12</u>

17. Defendants contend plaintiff's request for information of all bad faith lawsuits during the pendency of the *Tate* case would "spawn the sort of disproportional side of litigation and discovery that the courts do not permit." Def. Resp. at 9. Defendants, however, fail to support their assertion of lack of proportionality with any evidence. Instead,

> [a]n objecting party must specifically establish the nature of any alleged burden, usually by affidavit or other reliable evidence. To disclose the nature of [the] burden [of the discovery request], the objector must do more than just state the objection, the objector must submit affidavits or offer evidence which reveals the nature of the burden. Although counsel provided some information ... suggesting that a burden will be imposed, we do not know the precise extent of that burden, nor has such information been properly supported by an affidavit or otherwise.

<u>Boyer v. Gildea</u>, 2008 WL 4911267 at *5 (N.D. Ind. 2008). It is widely accepted that "[a]rguments in a …brief, unsupported by documentary evidence, are not evidence." <u>U.S. v. Stevens</u>, 500 F.3d 625, 628-29 (7th Cir. 2007). "Without more than the … generalized claim that the requests touch a multitude of documents, the Court cannot weigh the nature of the burden against the worth of the discovery. <u>Boyer</u> 2008 WL 4911267, at *5.

18. Defendants also contend this information is relevant neither to plaintiff's claims nor punitive damages. Information concerning other bad faith lawsuits brought against defendants during the period in which the *Tate* case was pending is relevant to defendants' business policies and practices, including defendants' retention of conflicted defense counsel and its practice of refusing to negotiate and accept policy limit settlement demands. Many jurisdictions have recognized the relevance of "other claims" discovery with respect to bad faith business practices and punitive damages. <u>See</u> e.g. <u>Hawkins v. Allstate Insurance Company</u>, 733 P. 2d 1073 (Ariz. 1987); <u>see</u> also <u>Saldi v. Paul Revere Life Ins. Co.</u>, 224 F.R.D. 169 (E.D. Pa. 2004); <u>State Farm v. Campbell</u>, 538 U.S. 408, 419 (2003).

19. Defendants cite to authority purportedly saying that a request for all bad faith lawsuits are "fishing expeditions" but plaintiff is not seeking all bad faith lawsuits—it is seeking bad faith lawsuits during the pendency of the *Tate* claim. Nevertheless, the cases defendants cite are either outdated or distinguishable. In the majority of the cases cited, the insurer's business practices were not at issue like they are here. See e.g. St. Paul Reins. Co. v. Commercial Fin. Corp., 197 F.R.D. 620, 644 (N.D. Iowa 2000). In AG Equip. Co. v. AIG Life Ins. Co., the court denied discovery because plaintiff's complaint made no allegations whatsoever of a general business practice and no such evidence was proffered in support of the requested discovery. AG Equip. Co., 2008 WL 5205192 at *5. Defendants misinterpret the reasoning in AG Equip Co., saying that discovery was denied because there was no assurance that other bad faith claims would have relevance. Discovery was actually denied by the court primarily because discovery was already closed. Id.

20. Defendants also cite to State Farm v. Campbell, 538 U.S. 408, 419 (2003) to argue that because prior conduct evidence is not admissible at trial, plaintiff is not entitled to information concerning prior bad conduct during discovery. This is not the standard. The admissibility of defendants' out of state conduct at trial is not at issue here—this is a discovery motion. Rather, "[l]iberal discovery is permitted in federal court to encourage full disclosure before trial." White v. Kenneth Warren & Son, Ltd., 203 F.R.D. 364 (N.D. Ill. 2001). Courts consistently point out that discovery is concerned with "relevant information" not "relevant evidence." The scope of relevance for discovery purposes is necessarily broader than trial evidence. Murata Mfg. Co., Ltd. v. Bel Fuse, Inc., 422 F. Supp. 2d 934, 945 (N.D. Ill. 2006); Boyer v. Gildea, 2008 WL 4911267, at *2 (N.D. Ind. Nov. 13, 2008).

21. Defendants further ignore that the Supreme Court in Campbell recognized an insurer's prior bad acts with respect to similar conduct within the same state, even if not identical, were relevant and discoverable. Id. 538 U.S. at 423. Thus, at minimum, the bad faith

10

cases brought against defendants in Illinois during the pendency of the *Tate* claim are relevant and discoverable.

### EXCESS VERDICT & POLICY LIMIT DEMAND REJECTIONS
### INTERROGATORY NO. 9

22. Plaintiff is seeking information concerning the claims in which excess verdicts were rendered after defendants rejected policy limit settlement demands. Plaintiff is seeking information during the period in which the *Tate* claim was pending. This request is extremely narrow, and seeks information relevant to defendants' business practices and policies.

23. Defendants object on the grounds that this request is too broad, and argue that it is not proportional to the needs of the case. Def. Resp. at 12. Defendants, however, waived their proportionality objection. Defendants did not make a proportionality objection to this interrogatory in their written response to plaintiff's interrogatories. See Exhibit 4. In the event of an untimely objection, waiver is the rule and not the exception. Autotech at 398 at 2.

24. Nevertheless, defendants cite to AG Equip. Co. again to support their argument that this request should be denied because it would require new discovery. In AG Equip. Co. discovery had already closed and the court denied the request because "opening the door to comparative claims discovery will inevitably derail the schedule of this case, needlessly increase costs and delay resolution of this matter." Discovery is still open in this case and any ancillary investigation of the information would be done by plaintiff on its own, without any additional burden or cost to defendants.

25. Defendants' remaining arguments concerning admissibility of evidence are premature. Discovery is concerned with "relevant information" not "relevant evidence." The scope of relevance for discovery purposes is necessarily broader than trial evidence. Murata Mfg. Co., Ltd. v. Bel Fuse, Inc., 422 F. Supp. 2d 934, 945 (N.D. Ill. 2006).

## **CONCLUSION**

26. For the above reasons and for the reasons stated by plaintiff in its motion to compel (docket no. 60) plaintiff respectfully requests an order compelling defendants to fully respond, without objections, to plaintiff's interrogatories nos. 6, 7, 9 and 12 and produce all internal emails and personnel files within seven days of this Court's order. Plaintiff also requests that this Court award plaintiff its reasonable attorneys' fees and costs in pursuing this motion and any other relief this court deems just and proper.

Dated: November 1, 2016

                                                  Respectfully submitted,
                                                  THE SURGERY CENTER AT 900 N.
                                                  MICHIGAN AVE., LLC
                                                  ____/s/George W. Spellmire_____
                                                  Attorney for Plaintiff, The Surgery Center at
                                                  900 N. Michigan Ave., LLC

George W. Spellmire
Jessica L. Dagley
SPELLMIRE LAW FIRM LLC
233 S. Wacker Drive, Suite 5210
Chicago, Illinois 60606
ARDC # 2686007
ARDC # 6315834
gws@spellmirelaw.com
jlw@spellmirelaw.com
 (312) 258-9400

## **CERTIFICATE OF SERVICE**

Pursuant to FED. R. CIV. P. 5(b)(3) and the Northern District of Illinois' LR 5.9, I have thereby electronically served all Filing Users with a copy of Plaintiff's Reply in Support of its Motion to Compel.

I, the undersigned attorney, certify that I have also served a paper copy of Plaintiff's Reply in Support of its motion to compel as required by FED. R. CIV. P. 5(a) by first class U.S. Mail, proper postage pre-paid, deposited in the U.S. mail depository before 5:00 p.m. on November 2, 2016 upon:

                                              ____/s/George W. Spellmire_____
                                              *One of the Attorneys for the Plaintiff*

**Service List:**
James J. Stamos
Benjamin F. Klimek
STAMOS & TRUCCO LLP
One East Wacker Drive, Third Floor
Chicago, Illinois 60601
jstamos@stamostrucco.com
bklimek@stamostrucco.com
Telephone: (312) 630-7979
Facsimile: (312) 630-1183

Floyd P Beinstock
Steptoe & Johnson LLP
201 E Washington Street
Phoenix, AZ 85004
fbeinstock@steptoe.com
(602) 257-5200