**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE SURGERY CENTER at 900 NORTH MICHIGAN AVENUE, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 15 cv 4336 |
| AMERICAN PHYSICIANS ASSURANCE CORPORATION, INC., AMERICAN PHYSICIANS CAPITAL, INC. | ) ) ) ) | Judge Sharon Johnson Coleman  Magistrate Judge Jeffrey Cole |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, The Surgery Center at 900 North Michigan Avenue ("The Surgery Center") has

filed a motion to compel the defendants, American Physicians Assurance Corporation ("APAC") and

American Physicians Capital ("APC") to produce documents in response to plaintiff's Document

Requests No. 12, and to respond to plaintiff's Interrogatories Nos. 6, 7, 9, and 12. This is the second

go-round for the parties in this discovery dispute.

This case began in the Illinois state court as a medical malpractice case. The plaintiff,

Gwendolyn Tate, sued The Surgery Center after she suffered a perforated bowel during surgery and

developed sepsis-related complications. The sepsis led to necrotizing fasciitis, which left Ms. Tate

a quadriplegic. (Dkt. # 54-2, at 1-5). American Physicians Assurance Corporation ("APAC") was

The Surgery Center's malpractice carrier on a policy with a $1 million limit and retained the law firm

of Lowis & Gellen as defense counsel in Ms. Tate's suit against The Surgery Center. (Dkt. #22, ¶

20; #67, at 1). As the case progressed, the state trial court granted a portion of The Surgery Center's

motion for summary judgment, but the appellate court overturned that ruling and remanded the case

for a trial on December 4, 2009. (Dkt. # 54-2).

According to The Surgery Center's Complaint, in the ensuing weeks, defense counsel told APAC that Ms. Tate's case was weak and that The Surgery Center had a 90% chance of winning. (Dkt. #52, ¶ 39). Shortly thereafter, on May 11, 2010, Ms. Tate made a settlement demand for the $1 million policy limits. (Dkt. #52, ¶ 40). APAC rejected the offer and said it would not be negotiating. (Dkt. #52, ¶¶ 42-43). About a week before trial, APAC wrote to The Surgery Center to express its confidence in defending the claim, but also reminding The Surgery Center that the policy limit was $1 million, that a verdict could be in excess of that, and The Surgery Center might want to retain independent counsel in view of those circumstances. (Dkt. # 52-8). Once trial began and a day-in-the-life video was presented, The Surgery Center asked APAC and defense counsel if anything could be done to avoid going through with the trial. (Dkt. # 52, ¶¶ 47-50). The Surgery Center alleges that neither counsel nor APAC informed it of any options at that point, and, following trial, the jury returned a verdict against The Surgery Center for $5.2 million. (Dkt. #52, ¶¶50, 51).

The facts as alleged are an example of the classic heads-I-win-tails-you-lose scenario the Seventh Circuit described in *Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175 (7th Cir. 1994):

> Suppose the claim was for $2 million, the policy limit was $1 million, the plaintiff was willing to settle for this amount, but the defendant's insurer believed that if the case was tried the plaintiff would have a 50 percent chance of winning $2 million and a 50 percent chance of losing. The insurer's incentive would be to refuse to settle, since if it lost the trial it would be no worse off than if it settled—in either case it would have to pay $1 million—but if it won it would have saved itself $1 million. It is in order to quench this kind of temptation that the liability insurer's duty to settle in good faith was read into liability insurance contracts.

23 F.3d at 1179. Here, the policy limit was $1 million, and the potential exposure from a jury verdict was unknown. But the fact that Ms. Tate lost the use of her arms and legs might make some think

that, in the event of a verdict for her, $1 million would be a bargain. In any case, The Surgery Center sued its law firm for legal malpractice and, here, APAC and APC for breach of fiduciary duty and duty to act in good faith.

Originally, the plaintiff filed a motion to compel compliance with *ten* document requests and *six* interrogatories. At that time, the plaintiff claimed that the parties had complied with Local Rule 37.2, which requires parties to meet and confer in an attempt to resolve discovery disputes. *See generally, Chamberlain Group v. Lear Corp.*, 2010 WL 2836975, 1 -2 (N.D.Ill. 2010)(St. Eve, J.)(citing and quoting *Paulcheck v. Union Pac. R. Co.*, 2010 WL 1727856 *1 (N.D.Ill. 2010)). But, according to the plaintiff's motion, the bulk of the discovery disputes arose in the course of the two months *after* the parties negotiated, and thereafter, the parties claimed they were unable to arrange a time to address the new disputes [Dkt. #48, at 2-4] – although the Federal and Local Rules require such a conference. Plaintiff gave the defendant 4 days in which to meet, and defendant said that wouldn't work. And, so, plaintiff filed its first motion to compel. The next day, in a minute order dated July 28, 2016, I pointed out that this fell far short of the good faith attempt to negotiate envisioned by the Local Rule and denied the plaintiff's motion without prejudice. The parties were ordered to comply with the Rule. [Dkt. # 50, citing a number of relevant authorities].

The rationale of the Local Rule was, not surprisingly, vindicated, as the parties pared the requests and interrogatories at issue by more than half. The remaining disputes are discussed below.

**Document Request No. 12**

After some negotiating, The Surgery Center has narrowed this request to personnel files of those involved in the Gwendolyn Tate claim, and information regarding: (i) claims representative performance planning and evaluations; (ii) annual performance evaluations; (iii) internal

communications or memoranda concerning promotions, performance evaluations, and annual goals/incentives; (iv) history of salary and promotions/demotions; and (v) indemnity and expense goals. The idea, apparently, is that insurance companies might have bonus and incentive programs that can arguably lead to bad faith handling of claims. *See, e.g., Saldi v. Paul Revere Life Ins. Co.*, 224 F.R.D. 169, 183–84 (E.D. Pa. 2004); *Ghorbanian v. Guardian Life Ins. Co. of Am.*, 2016 WL 4467942, at *2 (W.D. Wash. Mar. 31, 2016); *Dziadek v. Charter Oak Fire Ins. Co.*, 2014 WL 820049, at *7 (D.S.D. Mar. 3, 2014).

Defendants wisely don't dispute the relevance of much of this evidence. Personnel files are not sacrosanct and are often required to be produced in discovery. *See, e.g., Lee v. Chicago Youth Centers*, 304 F.R.D. 242, 251 (N.D.Ill.2014); *Hodgdon v. Northwestern University,* 245 F.R.D. 337, 341 (N.D.Ill.2007); *Vukadinovich v. Griffith Public Schools,* 2008 WL 5141388, *9 (N.D.Ind.2008). Indeed, defendants' ultimate objection to this request is that The Surgery Center already has discovery that shows that APAC had no bonus programs. [Dkt. # 67, at 2]. Defendants point to the seven-year-old deposition of Cathy Shutack, APAC's vice president of claims, from a 2007 Kentucky case (Dkt. # 67-2) that APAC's only bonus program in 2004 [Dkt. # 67-3] was based on overall company performance, and no bonuses were awarded to adjusters based on claim outcomes. Thus, the defendants maintain that the issue is settled, and The Surgery Center has no right to even limited discovery of the personnel files of adjusters working on the Gwendolyn Tate claim. In other words, The Surgery Center – and ultimately the court – have to take APAC's vice president's word for it.

But the American legal system works quite differently. If the defendant pleads not guilty at an arraignment, the charges are not dismissed; if a party claims something at a deposition, the

opposing party need not take the deponents' word for it; a contention that something is true or untrue at a deposition, especially in an unrelated case, does not foreclose further inquiry when the issue some years later rears its head again. And while the defendants would undoubtedly disavow so extreme a position, acceptance of their present refusal to allow a particular kind of discovery that might reveal bias or testimonial motivation of the law firm that handled the State court personal injury action or the insurance company that paid its bills would lead to precisely such a result.

But judges live in the real world, and lawyers must also. Under the procedures that govern proceedings in federal court, the rules have an expansive reach to prevent what Wigmore called trial by ambush and to assist in the settlement of litigated disputes. The law recognizes the sad truth that parties and witnesses can and do lie in judicial proceedings. *Schmude v. Tricam Ind., Inc.*, 556 F.3d 624, 628 (7th Cir. 2009). Even lawyers can fabricate testimony when it is to their or their employer's advantage. *See, e.g. FTC v. Advocate Health Care Network*, 162 F.Supp.3d 666, 671 (N.D.Ill. 2016)(in-house counsel filed false declaration in support of position advocated by employer); *Tellabs v. Fujitsu*, 283 F.R.D. 374 (N.D. 2012)(same). *Compare Schmidt v. Astrue*, 496 F.2d 833, 842 (7th Cir. 2007)("a treating physician may also 'bend over backwards' to assist a patient in obtaining benefits...").

No doubt, the purpose of the plaintiff's' present inquiry is to test the possible bias of the law firm and the insurance company in the underlying state court personal injury action. We see no reason why that inquiry cannot be reasonably pursued. Bias in its myriad forms is always relevant and never collateral. *United States v. Abel*, 469 U.S. 45 (1994); *United States v. Lindemann,* 85 F.3d 1232, 1243 (7th Cir.1996). And, the range of external circumstances from which probable bias and testimonial motivation may be inferred is, as Wigmore has noted, virtually infinite. *See, Outley v.*

*City of New York,* 837 F.2d 587, 594-595 (2nd Cir. 1988); *United States v. Vasquez,* 635 F.3d 889 (7th Cir. 2011); 3 A. Wigmore, Evidence §949 at 984; § 950 at 793 (Chadbourn Rev. 1970). Not surprisingly, therefore, the employment of an individual and/or the compensation he or she receives are always relevant to bias and credibility. *See North v. Russell*, 427 U.S. 328, 337 (1976); *Abel*, *supra* at 5*; Tumey v. Ohio*, 273 U.S. 510 (1927); *Evans v. Kataline*, 445 F. 3d 953, 955 (7th Cir. 2006); *Saperstein v. Hager*, 188 F.3d 852, 857 (7th Cir. 1999)("An employee of the defendants is not a disinterested witness. She is subject to their influence, in a sense in their power; and it is not easy to make a credibility determination from the face of an affidavit."); *Central Truck Lines v. Lott*, 249 F.2d 722, 724 (5th Cir. 1957); *In re Tylenol Marketing Sales Practices & Products Liability Litigation*, _F.Supp.3d_, 2016 WL 1569719 (E.D.Penn. 2016).[1]

Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Surely, that allows for The Surgery Center to access documents touching on the subject of incentive plans and bonuses – or whether they existed at the relevant time. The plaintiff should not be forced to rely on the questioning by an unknown attorney in a different case at a 2009 deposition in a case from 2007

---

[1] The Seventh Circuit has said that many so-called "experts" are often "the mere paid advocates or partisans of those who employ and pay them, as much so as the attorneys who conduct the suit ..." *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 382 (7th Cir. 1986). *See also, Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997); *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir. 1996). Evidence scholars have been no less critical of those "experts" who often testify as their "employers" may wish, without regard to the "truth" of their testimony. *See e.g.* Jack Weinstein, *Improving Expert Testimony,* 20 U.Rich.L.Rev. 473, 482 (1986) ("an expert can be found to testify to the truth to almost any factual theory, no matter how frivolous."); Michael H. Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Assurance of Trustworthiness,* Ill.L.Rev. 43, 45; 29 (1986)("Today practicing lawyers can locate quickly and easily an expert witness to advocate nearly anything the lawyers desire."); Huber, *Safety and the Second Best: The Hazards of Public Risk Management in the Courts,* 85 Colum.L.Rev. 277, 333 (1985) ("A Ph.D. can be found to swear to almost any expert proposition no matter how false or foolish.").

in Kentucky. The Surgery Center ought be able to test Ms. Shutack's seven-year-old claim with their document request, which seeks to determine who has the better of an argument going to an important issue in the case.

Defendants are unable to cite supporting authority, and all that exists is to the contrary. Indeed, apart from the general principles we have discussed above, cases which have dealt specifically with the kind of problem presented here do not support the defendants' position. *See, e.g., Doe v. Mastoloni*, 2016 WL 347292, at *3 (D. Conn. Jan. 28, 2016)(factual account given in deposition could be belied by documents); *Floyd v. City of New York*, 739 F. Supp. 2d 376, 384 (S.D.N.Y. 2010)(allowing discovery of documents to the extent they might corroborate or contradict deposition testimony). *See also Negrete v. Nat'l R.R. Passenger Corp*., 547 F.3d 721, 724 (7th Cir. 2008)(discussing documents that directly contradicted deposition testimony); *Pouncil v. Branch Law Firm*, 277 F.R.D. 642, 654 (D. Kan. 2011)(document request not duplicative where documents could contradict deposition testimony);

Beyond that, defendants state that they have offered for *in camera* review the personnel file of the adjuster who handled the Gwendolyn Tate claim, explaining that they are only concerned about confidentiality of employee files. But, as we have shown, employee files are not presumptively or automatically outside of otherwise proper discovery rules under the Federal Rules of Civil Procedure. Moreover, if the defendants' offer had to be accepted, discovery of a component of potentially valuable information would be replaced by obligatory *in camera* examination. Such an automatic rule of discovery is contrary to the Federal Rules of Civil Procedure and to the goal that discovery should be so far as possible conducted by counsel without judicial intervention except when necessary. And finally, while *in camera* discovery is permissible (and even desirable) in certain

circumstances, judges should be chary about accepting the responsibility for reviewing documents *in camera* and thereby substituting their limited knowledge of the case for that of counsel who is infinitely more familiar than the judge with what may be impeaching.

That there is a protective order, approved by Judge Coleman, that limits access to confidential materials in discovery does not necessarily change the outcome of this case. (Dkt. # 32, # 51). But its existence should have prevented at least a portion of what has divided the parties thus far. The parties seem to be in agreement that the personnel file in dispute qualifies as a confidential document under Judge Coleman's order. And that is the way that the disputed document will be treated. It will be turned over for an attorneys' eyes only inspection by the plaintiffs' counsel, who may not reveal the contents of the personnel file without further order of court.

**Interrogatory No. 6**

The Surgery Center asks APAC to identify the matters in which APAC retained Lowis & Gellen during the time period in which the Gwendolyn Tate claim was pending – 2003 to 2010 – and the total amount of fees APAC paid to the firm. Lowis & Gellen have said that they handled 239 cases for the defendants in the pertinent span. They were paid a quarter of a million dollars for their work on the Gwendolyn Tate case. At that rate, The Surgery Center estimates that the firm was dependent on the defendants for nearly $60 million in revenue over the relevant period of time. The Surgery Center wants more than just the defendant's estimate, however, arguing that the precise amount of money the firm has been paid by the defendants can show a close relationship that can skew the firm's representation of the insured in the defendants' favor. To ensure accuracy, the plaintiff need not take the defendants' word and should be entitled to at least part of the discovery they seek.

Defendants have two arguments against this request. The first is that The Surgery Center doesn't need specific case names and case files to learn how dependent Lowis & Gellen may be on the defendants. All The Surgery Center says it wants to know is how much the firm was paid in cases where they were retained by defendants [Dkt. # 60, at 7], so that's all they should get. Anything more would be out of proportion not only to the needs of this case, *see* Fed.R.Civ.P. 26(b)(1), but with what The Surgery Center claims it wants to know.

Defendants' other argument is that it is nonsensical to think that a law firm might have its motives and strategies swayed by its financial dependence to an insurance company. But, that contention ignores or minimizes the years of case law that have recognized that possible bias and partiality can be a function of an employee-employer relationship and that within reason and the bounds of proportionality discovery may explore that relationship. *See,* discussion *supra*. That contention also puts out of view the wealth of discussion and comment on the issue in cases and law journals. *See, eg., Utica Mut. Ins. Co. v. David Agency Ins., Inc.*, 327 F. Supp. 2d 922, 929 (N.D. Ill. 2004); *TIG Ins. Co. v. Giffin, Winning Cohen & Bodewes, P.C.*, 2002 WL 1803754, at *3 (N.D. Ill. Aug. 5, 2002); *Nandorf, Inc. v. CNA Ins. Companies*, 134 Ill. App. 3d 134, 137, 479 N.E.2d 988, 991 (1st Dist. 1985); *Employers Ins. of Wausau v. Albert D. Seeno Const. Co.,* 692 F. Supp. 1150, 1162 (N.D. Cal. 1988); Daniel M. Martinez, *Insurance Companies Use of "Captive" or In-House Counsel to Represent Insureds Constitutes the Unauthorized Practice of Law: Is American Home the Right Decision for Texas?*, 34 St. Mary's L.J. 1007 (2003); *Balancing the Tripartite Relationship Between Defendant, Defense Counsel, and Insurer*, 88 Ill. B.J. 384 (2000); Thomas D. Morgan, *Whose Lawyer Are You Anyway?*, 23 Wm. Mitchell L. Rev. 11 (1997).

In other words, this isn't some fictional scenario The Surgery Center just made up. When

a potential conflict arises – say, a policy limit settlement offer in a case where the liability might far exceed that limit – there is a reason why the insured must have the option of hiring its own lawyer. *See R.C. Wegman Const. Co. v. Admiral Ins. Co.*, 629 F.3d 724, 729 (7th Cir. 2011). In such a case, the insurer's lawyers have a conflict of interest between two clients: insurer and insured. In a case where the insured's representation is a "captive firm", the problem is exacerbated by the firm being financially beholden to the insurer. *See Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*, 832 F.2d 1037, 1045 (7th Cir. 1987)("Where the interests of the insured and the insurer conflict, however, there is a danger that the attorney appointed by the insurer may find it financially advantageous to protect the insurer's interests."). So, the financial tie between law firm and insurer is relevant.

That being said, it cannot be ignored that defendants do raise certain points regarding the substance of The Surgery Center's case. But these are matters to be resolved by a jury, not in deciding a pretrial discovery dispute. For example, the defendants' note that in a letter before trial, defendants informed The Surgery Center of the $1 million settlement offer, reminded plaintiff of the policy limit, and advised The Surgery Center that it may want to retain independent counsel. But the letter came only a week before trial, and thus the significance to be accorded the letter is not for a judge to decide in a discovery dispute, but for a jury to determine after hearing all the evidence at trial. Moreover, I have no authority to rule on substantive matters; the referral here is limited to discovery disputes. As the case stands, the discovery The Surgery Center seeks – pared down to how much the firm was paid in cases where they were retained by defendants – is relevant, and The Surgery Center is entitled to know precisely that amount. To learn that amount however does not require and the plaintiff is not entitled to a turnover of all of the files handled by the law firm in the relevant period.

**Interrogatory No. 7**

The Surgery Center asks defendants to identify all cases in which they retained Lowis & Gellen and in which attorney Jennifer Lowis was removed from the case during litigation. The Center argues that the replacement of the attorney who evaluated the case as having a $10 million value with one who estimated a 90% chance of victory shows defendants' total control of the defense. The Surgery Center further contends that this discovery is relevant to its allegations of a pattern and practice of bad faith claims handling. [Dkt. #60, at 9]. But, contrary to the Center's brief, the Complaint does not allege a "pattern and practice of unreasonable claims handling." Moreover, The Surgery Center does not make an argument that past practices might be relevant in the context of Fed.R.Evid. 406, *cf. First Fid. Bancorporation v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 1992 WL 55742, at *3 (E.D. Pa. Mar. 13, 1992)(refusing to allow discovery of past practice in bad faith insurance case); *Metzger v. Am. Fid. Assur. Co.*, 2007 WL 4342082, at *1 (W.D. Okla. Dec. 7, 2007)("In a bad faith insurance case, evidence of a defendant's treatment of other insureds is relevant and admissible pursuant to Federal Rule of Evidence 406 (habit) to prove the insurer engaged."), so any such argument could be considered as waived. *United States v. Stadfeld*, 689 F.3d 705, 712 (7th Cir. 2012); ('Undeveloped arguments are considered waived."); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.").[2]

But waiver is not obligatory, and a court has the discretion to invoke it. *Hormel v. Helvering*,

_____

[2] It also cannot be ignored, as defendants point out [Dkt. # 67, at 4, 6], that evidence like this – and case files from all of Lowis & Gellen's case with defendants over the pertinent period in response to Interrogatory No. 6 – would inevitably lead to a series of mini-trials necessitating additional discovery. Once again, there is a proportionality aspect to discovery under the Federal Rules of Civil Procedure and it is difficult to see how discovery like this fits in that scheme.

312 U.S. 552, 556-557 (1941); *United States v. Ready*, 82 F.3d 551 (2d Cir. 1996). *See also County of McHenry v. Insurance Co. of the West*, 438 F.3d 813, 820 (7th Cir. 2006). Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged or supported would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice. *Hormel v. Helvering*, 312 U.S. 552, 556-557 (1941). Here its application seems somewhat ill advised. The information sought is relevant to the meaning to be accorded by the jury to the fact – if indeed it is a fact – that in one or more cases Jennifer Lowis was replaced before trial (or perhaps during trial) by Lowis & Gellin.

The motion to compel is granted as to Interrogatory No. 7.

**Interrogatory No. 12**

In interrogatory No. 12, The Surgery Center asks for information on every suit brought against the defendants for bad faith/negligence during in the period from 2003 through 2011. The Center contends that this information is relevant to its claim for punitive damages. Apparently the theory is that if the plaintiff can show a multiplicity of bad acts extending over a long period of time, it will be entitled to seek more in compensation in damages in this case. It relies on *State Farm Mutual Automobile Ins. Co. v. Campbell,* 538 U .S. 408, 422 (2003) and *Lyon v. Bankers Life & Cas. Co.*, 2011 WL 124629, at *13 (D.S.D. Jan. 14, 2011). District court cases, even ones from this district, have no *precedentia*l value. *Van Straaten v. Shell Oil Products Co. LLC*, 678 F.3d 486, 490 (7th Cir. 2012). And, whatever *persuasive* value any district court case might have is often diluted in the discovery context where slight differences in the facts can spell the difference in outcome, and

where rulings involve an exercise of the very broad discretion district court's possess and review is necessarily deferential. *See, e.g., Aldridge v. Forest River, Inc.,* No. 10–2193, 2011 WL 781469, at *5 (7th Cir. Mar.8, 2011); *Arreola v. Choudry,* 533 F.3d 601, 605 (7th Cir.2008*).* Or, as Judge Posner has put it, "[t]he striking of a balance of uncertainties can rarely be deemed unreasonable...." *United States v. Bullion,* 466 F.3d 574, 577 (7th Cir.2006). Indeed, where discretion is involved, two judges can reach two correct yet contrary conclusions based on identical fact patterns. *Mejia v. Cook County, Ill.,* 650 F.3d 631, 635 (7th Cir. 2011); *United States v. Banks*, 546 F.3d 507, 508 (7th Cir. 2008). *Compare United States v. Boyd,* 55 F.3d 239 (7th Cir. 1995) *with United States v. Williams,* 81 F.3d 1434 (7th Cir. 1996).

While Interrogatory No. 12 is extremely broad – asking for information on *every* bad faith suit filed against defendants over the course of nine years – the request that was allowed in the South Dakota case was rather narrowly tailored to the specific circumstances of that case. There the plaintiff asked for "documents relating to litigation against defendant involving denial or discontinuation of benefits under policies of long term care insurance, from January 1, 2001 to present, where the denial or discontinuation is based on failure to meet benefit qualifiers." *Lyon*, 2011 WL 124629, at *13. The Surgery Center's sweeping request for information on every bad faith /negligence suit filed against the defendants from 2003 through 2011 has little in common with that necessarily limited request.

*State Farm* has a little something for everyone in this case, and each side simply ignores the support it arguably provides for the opposing sides' position. Plaintiffs focus on a single sentence from the opinion: "Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that

conduct must have a nexus to the specific harm suffered by the plaintiff." *State Farm*, 538 U.S. at 422. For The Surgery Center, this means that it is entitled to discovery of all bad faith suits brought against the defendants – name, date, court, case number – from 2003 through 2011. The defendants prefer to skip over that passage and quote the following:

> A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . .

538 U.S. at 422–23. For defendants, this means plaintiff isn't entitled to any discovery of bad faith claims at all.

*State Farm* wasn't about discovery; it was about relevant evidence and admissibility of evidence. The subset of evidence that is discoverable encompasses and is larger than the subset of evidence that is admissible. Consistent with the overall design of the Federal Rules of Evidence and the plain language of Rule 401, the federal courts are unanimous in holding that the definition of relevant is expansive and inclusive, *Sprint/United Management Co. v. Mendelsohn,* 552 U.S. 379, 387–388 (2008); *Daubert,* 509 U.S. at 587, and that the standard for admissibility is very low or minimal. *See, United States v. Boros,* 668 F.3d 901, 903 (7th Cir. 2012); *United States v. Falco,* 727 F.2d 659, 664 (7th Cir. 1984); *United States v. Murzyn,* 631 F.2d 525, 529 (7th Cir. 1980); *United States v. Needham,* 377 Fed.Appx. 84, 85–86 (2nd Cir. 2010); *United States v. Jordan,* 485 F.3d 1214, 1218 (10th Cir. 2007). The question is not whether the evidence has great probative weight, but whether it has any, and whether it in some degree advances the inquiry. *Thompson v. City of*

*Chicago,* 472 F.3d 444, 453 (7th Cir. 2006). [3]

This is even more true in the context of discovery than in the context of admissibility at trial. *Davis v. Duran* 2011 WL 1792699, 2 (N.D.Ill.2011). So, plaintiff is correct that the information it seeks is discoverable, at least in part, since it is potentially relevant. But that's as far as it goes. When one combines the fact that all the evidence sought in Interrogatory No. 12 may not be admissible at trial – not all the bad faith claims will have a nexus to the specific harm to plaintiff here, 538 U.S. at 422 – with the proportionality aspect of Fed.R.Civ.P 26(b), plaintiff's interrogatory casts far too large a net. It is perhaps understandable to cast a wide net when The Surgery Center hopes to paint defendants' failure to settle the case at the policy limit as intentional (i.e. having been accomplished in bad faith) when The Surgery Center's negligence left Ms. Tate a quadriplegic, and cost an additional $4 million in damages. But not every bad faith claim brought to court is proven or even valid. And defendants are right to suggest that allowing the particular discovery sought by the plaintiff is too broad, will assuredly result in disputes over the validity of those claims, which will require. further extensive discovery and perhaps mini-trials of the suits.

But that does not mean that none of the evidence sought by the interrogatory is outside the proper limits of discovery. Information would also appear to be relevant and thus discoverable under Rule 404 (b), Federal Rules of Evidence. *Gastineau v. Fleet Mortg. Corp.* 137 F.3d 490, 495-496 (7th Cir. 1998). *See* Jeffrey Cole*, "Bad Acts" Evidence in Civil Cases Under Rule 404(b): It's*

---

[3] As Professor McCormick has aptly phrased it, to be relevant, evidence need only be a brick, not a wall. *See also Huddleston v. United States,* 485 U.S. 681, 691 (1988)(" '[I]ndividual pieces of evidence insufficient in themselves to prove a point may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.' ").

*Not Just For Prosecutors Anymore*, 37 LITIGATION 47 (Spring 2011).[4] Suppose that discovery would reveal a pattern of behavior by the insurance company that resulted in an inflexible refusal to pay policy limits no matter what the evidence. To say that discovery of such evidence is not relevant and may not lead reasonably to admissible evidence under the extremely broad definition of relevancy under the Federal Rules of Civil Procedure and the consistent case law interpreting them is incorrect.

The problem, however, is that the request at least potentially seeks too much information. First, the period of time is too long. Four years should be the starting point. If there is nothing found within this period, it seems doubtful that there will be information before then or at least not information that may not be episodic and thus irrelevant to the theory on which the interrogatories are (or can be) based and which *State Farm* allows. The farther back the information sought does not exist the less relevant and the less supportive is the information.

Accordingly, the motion to compel is granted in part and denied in part as to Interrogatory No. 12.

**Interrogatory No. 9**

The Surgery Center asks for details on every claim from 2003 through 2011 in which an excess verdict was rendered, the policy limit in those claims, whether a policy limit settlement

---

[4] Rule 404(b) is a particular application of the general rule of relevancy. It provides in essence that evidence of a person's crime, wrong, or act is not admissible to prove propensity. It may, however, be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or accident. This list of permissible uses is illustrative, not exhaustive. *Old Chief v. United States,* 519 U.S. 172, 196 (1997). Rule 404(b) encompasses "*any* act" as long as it is relevant, which Rule 401 expansively defines as evidence having "*any* tendency" to make the existence of "*any* fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." (Emphasis supplied).

demand was made in those claims, and the amount of the verdict in those claims. The Center claims this request is "narrow in scope," but fails to explain how a request encompassing *every* claim in which an excess verdict was rendered can be discoverable. The Center seems to be misreading its own interrogatory [*Cf.* Dkt. #60, at 11-12, *with* Dkt. #60-2, at 4] which, as written, clearly asks for information on these claims whether or not a policy limit settlement demand was made. If no policy limit settlement was made and rejected, it is difficult to see how the discovery can have any connection to this case. The defendants need only produce at this juncture information sought about cases between 2006 – 2011 in which a policy limit demand was made and was rejected by the carrier and an excess verdict returned.

**Document Request Nos. 5 and 6**

The Surgery Center asks for the defendants' internal communications, specifically emails, concerning the Gwendolyn Tate claim. The defendants do not deny the relevance and producibility of such information. They merely claim that the two internal emails from the period of 2003 through 2009 are all that pertain to the underlying state court case. Defendants claim that they have produced all requested emails and have repeatedly informed The Surgery Center's counsel of this numerous times. They make no further argument that any other emails have been withheld, although they have produced what they call a privilege log and state, "[a]t no time have Defendants indicated that there are emails in existence they are refusing to produce or list on their privilege log, . . . ." The Surgery Center's reply to this position is one of dubiety, and that the defendants' privilege log listing withheld emails is woefully inadequate.

Discovery in this case began in February 2016 and fact discovery was originally set to close on August 1, 2016. [Dkt. ##18, 19]. The Surgery Center propounded the document requests at issue

here on March 29, 2016. [Dkt. #60, at 2]. When the defendants responded on May 9th – over a week late under Fed.R.Civ.P. 34(b)(2), although The Surgery Center allowed them an extension – they indicated that all non-privileged documents had been produced. They didn't produce a privilege log to support that claim, however, even though they were required to under Fed.R.Civ.P. 26(b)(5). *Hobley v. Burge*, 433 F.3d 946 (7th Cir. 2006). Arguably, they waived their claim of privilege as to these unidentified documents then and there. *United States v. BDO Seidman*, 337 F.3d 802, 811 (7th Cir. 2003)("The mere assertion of a privilege is not enough; instead, a party that seeks to invoke the attorney-client privilege has the burden of establishing all of its essential elements."); *Rao v. Bd. of Trustees of the Univ. of Illinois*, 2016 WL 6124436, at *7 (N.D. Ill. Oct. 20, 2016)("A timely and adequate privilege log is required by the federal rules, and the failure to serve an adequate and timely privilege log may result in a waiver of any protection from discovery."); *Patrick v. City of Chicago*, 111 F. Supp. 3d 909 (N.D. Ill. 2015); *Buonauro v. City of Berwyn*, 2011 WL 3754820, at *8 (N.D. Ill. Aug. 25, 2011)("A litigant cannot withhold documents after it is served with discovery requests based merely on its own decision that a privilege exists, and the failure to provide a privilege log can result in a waiver of *the* protection that would otherwise be available."); *Babych v. Psychiatric Solutions, Inc.*, 271 F.R.D. 603, 608 (N.D.Ill.2010) ("[A] timely and adequate privilege log is required by the federal rules, and... failure to serve an adequate privilege log may result in a waiver of any protection from discovery.").

As the parties continued to joust over discovery into the summer, and Judge Coleman extended fact discovery until September 30, 2016 [Dkt. # 46], defendants still hadn't produced a privilege log. When The Surgery Center filed its initial motion to compel on July 27th, there was still no privilege log from defendants. The parties then went back to the drawing board in an attempt to

resolve their discovery dispute over the course of the month of August. Still, the defendants produced no log and did not amplify their scant, unsupported claim that the only documents they were withholding were somehow privileged. Then in a telephone conference with me on September 7th, counsel for the defendants represented that defendants had already produced a privilege log. [Dkt. #53]. As The Surgery Center's attorney seemed dubious, I reminded counsel that the failure to produce a complete and timely privilege log can result in a waiver of the claim of privilege. [Dkt. # 53]. *See Patrick v. City of Chicago*, *supra* at 18; *Sommerfield v. City of Chicago*, 252 F.R.D. 407, 418 (N.D. Ill. 2008). As it turns out, the defendants had still not produced a log.

Since Rule 26(b)(5)(A) does not contain a time limit within which a privilege log must be submitted, the cases are not harmonious as to when a privilege log is impermissibly late and whether forfeiture of a claimed privilege is a consequence of a belated filing. *See* the discussion in *Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Montana,* 408 F.3d 1142, 1147–1149 (9th Cir. 2005). Some cases find waiver resulting from untimeliness, *S.E.C. v. Yorkville Advisors, LLC,* 300 F.R.D. 152, 167 (S.D.N.Y.2014), others do not. *Thermoset Corp. v. Building Materials Corp. of America,* 2015 WL 1565310, *6 (S.D.Fla. 2015); *McKeen–Chaplin v. Provident Savings Bank, FSB,* 2015 WL 502697, *11 (E.D.Cal.2015). It is ultimately a discretionary decision, and thus, as we have shown, *supra* at 13, cases holding one way or the other are not conclusive, for "'[t]he very exercise of discretion means that persons exercising discretion may reach different results from exact duplicates.'" *McCleskey v. Kemp,* 753 F.2d 877, 891 (11th Cir.1985), *aff'd, McCleskey v. Kemp,* 481 U.S. 279, 289–290 (1987).

In an email to counsel for The Surgery Center dated September 15, 2016, counsel for the defendants promised a privilege log would be forthcoming and addressed the concerns The Surgery

Center had. [Dkt. # 69-1]. The long-delayed privileged log was finally produced on September 19, 2016. [Dkt. ## 60-3, 69-3]. This was four and a half months after defendants' responses to The Surgery Center's document requests were due, almost two months after the parties had initially agreed fact discovery would close and, worst of all, two weeks after counsel for the defendants had assured the court that a log had already been produced.

Beyond its lateness, Fed.R.Civ.P. 26(b)(5) requires that, entries in a privilege log describe the documents in a manner that allows the reader to assess the claim. The rule must be read in conjunction with long-standing case law making it clear that the party asserting a privilege has the burden of establishing all of its elements on a document by document basis, and that privileges are narrowly construed. *University of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 189 (1990); *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991); *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983).

The privilege log the defendants submitted is just 27 documents long. Examples of descriptions of documents include "Communication with counsel representing APA re: APA's interests", "Attachments to Email", "Email chain" or "Email string re: report of potential claim." Although the defendants had several months to prepare this log, the descriptions of the 27 documents are inadequate. *Muro v. Target Corp.*, 250 F.R.D. 350, 362-364 (N.D.Ill.2007).

To be privileged, a communication must involve the seeking or providing of legal advice. *White*, 950 F.2d at 430. Accordingly, it is not self-evident *that* every "communication with counsel" is privileged – and in fact it is not, *Radiant Burners, Inc. v. American Gas Ass'n*, 320 F.2d 314, 324 (7th Cir. 1963); *Steele v. Lincoln Financial Group,* 2007 WL 1052495, at * 2 (N.D.Ill. 2007); *Lee v. Chicago Youth Centers* 2014 WL 2618537, 4 (N.D.Ill.2014). Parties often get away with terse,

conclusory descriptions because when a discovery dispute comes to court, the party claiming privilege has fleshed out its claims in its brief. Here, as noted, after several months and thorough briefing of two motions to compel, all we have from defendants is: "[a]t no time have Defendants indicated that there are emails in existence they are refusing to produce or list on their privilege log." If the late-filed, inadequate privilege log is not a waiver, that certainly is.

It bears repeating that unsupported and undeveloped arguments are deemed waived. *See Price v. Board of Educ. of City of Chicago*, 755 F.3d 605, 608 (7ᵗʰ Cir. 2014); and cases cited *supra* at 11. Here, defendants have not established the elements of the privilege as to each document they are withholding from discovery. They have made a blanket claim, in a single sentence, without citation to any pertinent authority. They withhold many documents under a claim of "Insured-Insurer" privilege, but fail to flesh this claim out or even attempt to establish it is applicable here. [5]

In concluding that the defendants have waived any privilege they might have had over the documents at issue in The Surgery Center's Request Nos. 5 and 6, the Ninth Circuit's discussion of waiver in *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142,

---

[5] Illinois is among a minority of jurisdictions that recognize an "insured-insurer" privilege. *People v. Ryan*, 30 Ill. 2d 456, 197 N.E.2d 15 (1964). The idea is that when an insured communicates with its insurer, and the insurer is under an obligation to retain counsel on behalf of the insured, "the insured may properly assume that the communication is made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured." 30 Ill. 2d at 461, 197 N.E.2d at 17. But, as with any privilege, in this court, the party asserting it must establish its elements on a document-by-document basis. Even in the courts of the state of Illinois, an unadorned claim is inadequate. *See e.g, Holland v. Schwan's Home Serv., Inc*., 992 N.E.2d 43, 85 (5ᵗʰ Dist. 2013)(detailing elements the party claiming insured-insurer privilege must prove). Defendants don't go into Illinois' "insured-insurer" privilege, other than to invoke it, like a talisman. They don't go into Fed.R.Evid. 501. They don't go into an applicable law analysis. Instead, they merely say, "[a]t no time have Defendants indicated that there are emails in existence they are refusing to produce or list on their privilege log." That does not establish the adequacy of the law and thus constitutes a waiver of the argument.

Of course, that does not mean that emails exist beyond the few that have been produced or that the defendants can be forced to disclose that which they do not have.

21

1149 (9th Cir. 2005) is informative:

> using the 30–day period as a default guideline, a district court should make a case-by-case determination, taking into account the following factors: the degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld documents is privileged . . . ; the timeliness of the objection and accompanying information about the withheld documents (where service within 30 days, as a default guideline, is sufficient); the magnitude of the document production; and other particular circumstances of the litigation that make responding to discovery unusually easy . . . or unusually hard. These factors should be applied in the context of a holistic reasonableness analysis, intended to forestall needless waste of time and resources, as well as tactical manipulation of the rules and the discovery process. They should not be applied as a mechanistic determination of whether the information is provided in a particular format.

408 F.3d at 1149.

Here, the defendants click off all the boxes in favor of finding a waiver. Their assertion of the privilege, which is merely an unamplified, blanket assertion with a few terse document descriptions, does not allow the kind of meaningful evaluation of the claim as to each of the withheld documents that the cases demand. The magnitude of the document production was small, making it very easy to have complied with the rules and applicable case law. Accordingly, the defendants must produce all the withheld documents listed in their log, with the exception of the few described as pertaining to unrelated claims.

## CONCLUSION

For the foregoing reasons, The Surgery Center's motion to compel [Dkt. #60] is granted in part and denied in part.

**ENTERED:** _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 11/29/16