UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THE SURGERY CENTER at 900 NORTH MICHIGAN AVENUE, LLC, </br>　　　　Plaintiff, </br>　　v. </br>AMERICAN PHYSICIANS ASSURANCE CORPORATION, INC., and AMERICAN PHYSICIANS CAPITAL, INC., </br>　　　　Defendants. | Case No. 15-CV-4336 </br></br>Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, The Surgery Center at 900 North Michigan Avenue, LLC ("TSC"), filed suit against Defendants, American Physicians Assurance Corporation, Inc., and American Physicians Capital, Inc. (collectively "APAC") alleging that APAC acted in bad faith by not settling the underlying law suit in the Circuit Court of Cook County, IL—*Tate v. The Surgery Center at 900 N. Michigan Ave, LLC*, Case No. 03-L-6090. TSC also alleges that APAC breached its fiduciary duties and institutional liability to the Surgery Center under their insurance contract, and that APAC had a tacit agreement with the defense counsel to not fully advise the Surgery Center in the underlying suit. APAC now moves for summary judgment on all three claims. For the foregoing reasons, APAC's Motion for Summary Judgement [218] is denied. APAC's Alternative Motion for Summary Judgment [220] addresses the same matters and requires the same consideration of this Court as the aforementioned motion. It is also denied.

**Background**

The following facts are undisputed unless noted. On November 26, 2002, Dr. Harrith Hasson ("Dr. Hasson") performed a laparoscopic surgery on Gwendolyn Tate ("Tate") at the TSC facility. Four days later, Tate was admitted into the hospital with complications that left her

1

quadriplegic. Tate sued both Dr. Hasson and TSC in the Circuit Court of Cook County State Court ("Tate Case") on May 21, 2003.

APAC was the professional liability carrier provider for TSC. TSC's insurance policy limit was set at $1 million. APAC hired the law firm, Lowis & Gellen to defend TSC in accordance with APAC's Defense Attorney Instructions. TSC contends that in 2005, while the Tate Case was pending, APAC's new vice president of claims implemented a company-wide policy, the "concrete plan," that would employ a more aggressive defense strategy. This included refusing to negotiate settlement and targeting certain high exposure claims for trial regardless of the risk imposed. While APAC agrees that the vice-president was asked by policyholders to adopt more aggressive tactics in defending and settling claims, APAC disputes the existence of an official plan that refused to negotiate settlement or pushed high exposure cases to trial. TSC states that the "concrete plan" was codified in a "best practices" newsletter and promoted to the policyholders and defense counsel; however, APAC characterizes information as mere marketing material with no manipulative intent. TSC also contends that the "concrete plan" involved reducing the amount of defense firms APAC used to those who would abide by the expectations of the plan. APAC attributes the reduced number of firms to its effort to improve the consistency and quality of the attorneys hired to represent policyholders. Lowis & Gellen was on the approved list of firms, and was expected to adhere to APAC's Defense Attorney Guidelines per the contract. Parties dispute whether those guidelines included the "concrete plan." From 2003 to 2010, Lowis & Gellen earned over $10 million from cases referred by APAC. Both Jennifer Lowis ("Lowis") and Mark Smith ("Smith") of the Lowis & Gellen represented TSC in the Tate Case.

Guita Griffiths ("Griffiths") was the president of TSC. She was APAC and the defense counsel's point of contact for the *Tate* litigation. She is also a lawyer. APAC alleges that upon receiving Tate's complaint, it warned Griffiths about the risk of an adverse verdict against TSC and

2

TSC's right to retain its own personal counsel to advise TSC on settling the case.  TSC denies that APAC ever advised Griffiths on the aforementioned.

On November 8, 2004, APAC raised the Reserve, money put aside in the event that there is a verdict that has to be paid, to $560,000.  The Reserve amount, which represents the value of the Tate Case, was calculated by multiplying the Full Liability Value ($8 million) by the chance of losing (70%) and the insured's percentage share (10%).  APAC maintains that it does not use the methodology for determining the Reserve amount as a means of assessing the likelihood of success at trial.  TSC disputes this fact.  APAC labeled the Tate Case as "high exposure" because it believed the damages from an adverse verdict on the claim could exceed TSC's policy limit.

In July 2007, Tate's counsel offered to settle the case for the $1 million policy limit.  The parties dispute whether this offer was discussed with TSC before proceeding, but they agree that APAC rejected this settlement demand.  On August 3, 2007, Dr. Hassan settled with Tate for $1 million.  Lowis subsequently moved to reconsider TSC's summary judgment motion, and it was granted.  In December 2009, the Illinois Court of Appeals partially reversed the grant of summary judgment, finding that there was a triable issue with regard to whether TSC, through its nursing staff, breached the appropriate standard of care and whether that breach was a proximate cause of Tate's injury.  The Tate Case was remanded for trial proceedings.  In February 2010, APAC raised the Tate Case's Reserve to $1 million.  TSC maintains that this number reflected a determination that TSC had at least a 50% chance of losing at trial.  APAC again denies that the Reserve Evaluation Forms are used to assess the likelihood of success at trial, but also does not explain what factors go into the calculations.  APAC concurs that it did not inform TSC about increasing the Reserve, but it still maintains that 50% loss evaluation used in determining the Reserve did not impact the manner in which they assessed TSC's success since APAC always believed TSC's chances

3

of losing were no greater than 25%. That same month, APAC wrote TSC to advise them that they believed the case was defensible and they would likely prevail despite the result of the appeal.

On April 5, 2010, Smith stated that he believed TSC would have a 90% chance of winning at trial. TSC disputes the veracity of this figure and believes the statement was influenced by the "concrete plan," not an honest assessment of the likelihood for success. On May 11, 2010, before the trial, Tate sent APAC a settlement demand for the $1 million policy limit. Six days later, APAC rejected Tate's policy limit demand and wrote to advise TSC that they would not be entering into any settlement negotiations since the case was still defensible and that TSC would likely prevail at trial. APAC also asserts that it repeatedly advised TSC of the risk of a verdict in excess of the policy limits and of TSC's right to obtain personal counsel. TSC disputes that APAC discussed this settlement request, the risks of settlement versus trial, obtaining personal counsel, or APAC's decision not to negotiate with TSC with it before trial. TSC also asserts that, at the time of the second settlement offer, APAC was aware of several damaging facts, including that Tate would testify as to not receiving proper discharge instructions personally in violation of TSC's own rules and regulations, and that an expert would testify that the failure to properly discharge was a proximate cause of her injuries. APAC does not dispute these facts, but instead states their irrelevance.

After the trial concluded, the jury returned a verdict of $5.12 million in favor of Tate. TSC contends that APAC and defense counsel had a meeting about the adverse verdict, but they did not include TSC or Griffiths. Before the resolution of TSC's post-trial motions, and without informing APAC beforehand, Griffiths' personal counsel, who she retained after the verdict, contacted Tate's attorney about a settlement. TSC settled with Tate for $2.25 million, of which APAC paid the $1 million per the policy limit. TSC sued Lowis & Gellen for legal malpractice and obtained a settlement.

**Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also* Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact, and if done, judgment as a matter of law should be granted in its favor. *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 988 (7th Cir. 2006). "To determine whether genuine issues of material fact exist, we ask if 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013)(citing *Anderson*, 477 U.S. at 251-52). All evidence and inferences must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**Analysis**

APAC contends that it is entitled to summary judgment on TSC's claim that APAC acted in bad faith by not settling the Tate Case because TSC has not established that a duty to settle existed at the time that the policy-limit demand was made.

An insurance provider has a duty to act in good faith when responding to settlement offers. *Haddick v. Valor Insurance*, 198 Ill. 2d 409, 414, 763 N.E.2d 299, 261 Ill. Dec. 329 (2001). If the insurer breaches this duty by acting in bad faith, it can be liable for the entire judgment against the insured. *Id.* In order to sustain a successful claim for bad faith, TSC must prove that: (1) a duty to settle existed; (2) the insurer breached that duty; and (3) the breach caused injury to the insured. *Swedish American Hosp. Ass'n v. Ill. State Med. Inter-Insurance Exch.*, 395 Ill. App. 3d 80, 103, 916 N.E.2d 80, 99 (2009). A duty to settle arises for an insurer like APAC "when there is a reasonable

5

probability of recovery in excess of policy limits and there is a reasonable likelihood of a finding of liability against the insured." *Id.* (citing *Central Illinois Public Service Co. v. Agricultural Insurance Co.*, 378 Ill. App. 3d 728, 737, 880 N.E.2d 1172, 317 Ill. Dec. 180 (2008)). There is no duty however, until a third party demands a settlement within policy limits. *Haddick v. Valor Insurance*, 198 Ill. 2d 409, 417, 763 N.E.2d 299, 261 Ill. Dec. 329 (2001). Whether an insurer has acted in bad faith by failing to settle a claim is a question of fact for the fact finder. *Id.* at 419.

After reviewing the facts, the Court finds that APAC is not entitled to summary judgment because APAC's true assessment of the likelihood that TSC would be found liable and the amount of potential damages to which TSC would be exposed remain disputed material issues of fact. It is undisputed that APAC labeled the Tate Case "high exposure," which suggests that APAC knew there was a possibility of an adverse verdict with a money judgment greater than the policy limit from the onset. Upon proceeding with the post-remand trial, APAC and the defense counsel maintained that that there was only a 25% or less chance that TSC would be found liable. However, APAC still increased the Reserve amount for the case and did not inform TSC that they did so. The purpose behind APAC's decision to increase to the Reserve amount before trial, and the meaning behind the figures used to calculate the Reserve amount, remain in dispute. Further, they undermine the veracity of APAC's position that they were confident in TSC's success at trial and that the damages would be below the policies limit. Finally, the parties dispute whether the policy-limit settlement demand before trial, and the risk and liability concerns around trial were communicated to TSC before APAC rejected the offer.

While the record contains evidence that suggest the probability of an adverse finding against TSC was high and that a potential jury award would be in excess of the policy limit, the record also contains conflicting testimony and documents, in which APAC and defense counsel believed the case was also medically defensible. When such material issues of fact are presented, summary

6

judgment is inappropriate. *See SwedishAmerican Hosp. Ass'n*, 395 Ill. App. 3d at 105 (finding it inappropriate to resolve on summary judgment where questions of material fact remain about whether an insurer breached its good-faith duty to settle).

APAC also moved for summary judgment on Counts II and III under the simple premise that if this Court found that there was no breach of duty to settle, then the other claims failed as a matter of law. As the basis for summary judgment was completely dependent on the success of Count I, given the above analysis, this Court also denies summary judgment as to Counts II and III.

This Court also denies APAC's alternative motion for summary judgment. APAC contends that partial summary judgment as to Count II is appropriate because TSC has presented no evidence that APAC interfered with retained counsel's representation of TSC and directed defense counsel not to settle. The record does contain facts that call APAC's conduct into question. For example, the parties dispute what APAC's actual assessment of the risk and liability. They also dispute whether APAC discussed the risk and liability information with TSC before rejecting the policy-limit settlement demand. These facts are material to determining the underlying liability—whether APAC intentionally withheld critical information and impeded the litigation process to avoid settling the Tate Case. Accordingly, summary judgment is not appropriate under APAC's alternative argument either. The motion is denied.

**Conclusion**

Based on the foregoing, this Court denies both Defendants' Motions for Summary Judgment as to Counts I, II, and III, and Defendant's Alternative Motion for Partial Summary Judgment.
IT IS SO ORDERED.

ENTERED: SHARON JOHNSON COLEMAN
United States District Court Judge

Dated: 6/5/2018