UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE SURGERY CENTER at 900 NORTH MICHIGAN AVENUE, LLC, | |
| Plaintiff, | Civil Action No: 1:15-cv-4336 |
| v. | Hon. Sharon Johnson Coleman |
| AMERICAN PHYSICIANS ASSURANCE CORPORATION, INC., and AMERICAN PHYSICIANS CAPITAL, INC., | |
| Defendants. | |

## **DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

Pursuant to Federal Rule of Civil Procedure 50, APAC moves for judgment as a matter of law because no reasonable jury could find that TSC has met its burdens of proof on any claim. APAC therefore requests judgment on the entirety of Plaintiff's Second Amended Complaint or, alternatively, on Counts II and III, which, respectively, allege "Institutional Liability Punitive Damages" and "Concert of Action."

The Illinois Supreme Court has narrowly defined the common-law cause of action for "bad faith." As this Court has recognized, "to sustain a successful claim for bad faith, TSC must prove that: (1) a duty to settle existed; (2) the insurer breached that duty; and (3) the breach caused injury to the insured." (Doc. 304 at 5.) "The duty [to settle] does not arise at the time the parties enter into the insurance contract, nor does it depend on whether or not a lawsuit has been filed." *Haddick ex rel. Griffith v. Valor Ins.*, 763 N.E.2d 299, 304 (Ill. 2001). The duty also does not arise until a third party demands settlement within limits. *Id*. at 305. Even when a demand is made, the duty arises only if there is "a reasonable probability of a finding *of liability* against the insured." *Id*. at 304 (emphasis added). Consistent with its plain meaning, a "reasonable

probability" means "*at least more likely than not*." *Powell v. Am. Serv. Ins. Co.*, 2014 IL App (1st) 123643, ¶ 36, 7 N.E.3d 11 (emphasis added); *Hana v. Illinois State Med. Inter-insurance Exch. Mut. Ins. Co.*, 2018 IL App (1st) 162166, ¶ 35, – N.E.3d – (affirming these standards for a failure-to-settle claim).[1]

This is an *objective* assessment of the probability of an adverse verdict. *See, e.g.*, Ill. Pattern Jury Instr. – Civil § 710.00 ("The conduct of the insurer is tested against an objective – not a subjective – standard"). Again, this inquiry "applies at the time of the settlement demand," and after-the-fact evidence cannot be used retrospectively to decide whether there was a "reasonable probability" of a finding of liability against the insured. *Powell*, ¶ 42.

Before trial, this Court denied APAC's Motion for Summary Judgment based on a finding of disputed facts as to the likelihood that TSC would be found liable and the amount of potential damages to which TSC would be exposed. (Doc. 304 at 6.) To the extent any such fact issue previously precluded judgment as a matter of law, it has now been resolved. There is no dispute that the *Tate* case presented – and that TSC knew – from the outset that the likely damages would exceed TSC's policy limit *if* the jury were to find liability. And TSC has offered no evidence whatsoever that, at the time of Ms. Tate's settlement demands, it was objectively more likely than not that TSC would lose at trial on liability. Instead, TSC has endeavored to confuse the jury with unfounded assertions about collateral issues, such as APAC's reserving and reinsurance information, a New Mexico meeting with no nexus to the *Tate* claim, and non-existent conflicts of interests. Even if the jury were to believe those assertions, they are irrelevant to TSC's failure-to-settle claim. What Plaintiff's case-in-chief at this trial has demonstrated, however, is that everyone – Ms. Griffiths, TSC's clinical staff, all of the lawyers, and APAC –

---

[1] The Court in *Haddick* also set forth as a separate and distinct prerequisite to the duty to settle that there is "a reasonable probability of recovery in excess of policy limits." *Haddick*, 763 N.E.2d at 304. That element is not in dispute.

thought the *Tate* case was highly defensible as to both standard of care and causation. As such, the *Tate* case simply never triggered a duty for APAC to settle within TSC's policy limit.

Second, punitive damages are only a derivative penalty, and TSC's prayer for such an award falls with its untenable bad-faith claim. However, even if TSC's bad faith claim is permitted to continue to the jury, judgment should be granted on its punitive damages claim because it has failed to show that APAC engaged in the kind of outrageous conduct and reckless disregard that is required for the jury to consider the imposition of punitive damages, which is the only relief requested under TSC's Count II.

Third, TSC's concert-of-action claim in Count III cannot survive independently of its bad-faith claim unless APAC knowingly and substantially assisted defense counsel in breaching their professional obligations to TSC. Again, however, even if TSC's bad faith claim is permitted to continue, judgment should be entered on TSC's concert-of-action claim because TSC has failed to show that the lawyers at Lowis & Gellen breached any duty in defending TSC, much less that APAC knowingly and substantially assisted in such a breach. Indeed, defense counsel are presumptively independent contractors, and TSC faces a high bar in imposing liability on APAC for the conduct of these third parties.

One of the core purposes of judgment as a matter of law is to speed up litigation and avoid unnecessary trials. *Weisgram v. Marley Co.*, 528 U.S. 440, 451 (2000). Given TSC's failure to carry its burdens in its case-in-chief, and the likely jury confusion caused by TSC's introduction of collateral issues into this case, this Court should grant judgment as a matter of law to save the parties, the jury, and itself the time and expense of trying this unsupported case to a verdict. APAC requests that the Court enter judgment as a matter of law in its favor.

**ARGUMENT**

Judgement as a matter of law is appropriate because TSC has been fully heard and the jury lacks "a legally sufficient evidentiary basis to find for [TSC]." Fed. R. Civ. P. 50(a). The standard for judgment as a matter of law "mirrors" summary judgment under Rule 56. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). As such, a "mere scintilla" of evidence does not suffice; rather, TSC must come forward with enough evidence for a reasonable jury to derive a verdict in TSC's favor. *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 924 (7th Cir. 2000). TSC has failed to do so.

**I.     The *Tate* case never triggered the *Haddick* duty to settle within TSC's policy limit.**

   **A.     *At the time of Ms. Tate's pretrial settlement demands, it was objectively more likely than not that TSC would prevail.***

As the Illinois Supreme Court established in 2001 through *Haddick*, TSC may not recover against APAC for failing to settle the *Tate* case unless it proves that: "(i) the duty to settle arose; (ii) the insurer breached the duty; and (iii) the breach caused injury to the insured." *Powell*, 2014 IL App (1st) 123643, ¶ 18, 7 N.E.3d 11. TSC cannot satisfy these elements because it has not even attempted to show that there was ever "a reasonable probability of a finding *of liability* against the insured." *Haddick*, 763 N.E.2d at 304 (emphasis added). Again, a "reasonable probability" means "at least more likely than not." *Powell*, ¶ 36; *Hana*, ¶ 35. This standard "applies at the time of the settlement demand," and the fact that TSC ultimately lost the *Tate* case cannot be used retrospectively to conclude that, at the time of the pretrial demands, there was a "reasonable probability" of liability. *Powell* ¶ 42; *see Kavanaugh v. Interstate Fire & Cas.*, 342 N.E.2d 116, 121 (Ill. App. 1975) (ultimate adverse outcome does not establish bad faith refusal to settle).

4

This Court previously ruled that summary judgment was not appropriate "because APAC's true assessment of the likelihood that TSC would be found liable and the amount of potential damages to which TSC would be exposed remain disputed material issues of fact." (Doc. 304 at 6.) Specifically, the Court found that "[t]he purpose behind APAC's decision to increase the Reserve amount before trial, and the meaning behind the figures used to calculate the Reserve amount, remain in dispute." (*Id.*) There is no longer any factual dispute about APAC's reserve calculations or why it increased the reserve amount on the *Tate* case.

As Ms. Shutack explained, APAC's 2004 Reserve Evaluation Form factored into its damages analysis a "chance of losing." (Ex. A, Tr. 389:11-25.)[2] Without that "chance of losing" in the reserve calculation, APAC's reserve would have been set at $1 million – the same reserve APAC later set after the *Tate* case had been remanded by the appellate court. (Tr. 390:1-8.) Ms. Shutack further explained that there was a "change in the methodology," and that APAC "took out the liability portion" on the reserve form – meaning the "chance of losing" – because the old form made it "too difficult to get an accurate number" and APAC "wanted to be more conservative." (Tr. 391:9-17.) Correspondingly, APAC's updated Reserve Evaluation Worksheet does not have a place to factor "chance of losing" into the analysis. (Pltf. Ex. 38.) The change in reserve on the *Tate* case was a result of this change in methodology, ***not*** in APAC's assessment of any chance of loss, which was not part of the reserving methodology in 2010.

In addition, Ms. Oblak, APAC's claims representative, testified in detail to each of the categories of damages that APAC used in setting its reserve in 2010. (Tr. 126:25-132:11.) Like Ms. Shutack, she explained that the "million-dollar reserve is just what we put aside in the event of an adverse verdict." (Tr. 189:16-19). Because of the potential damages and the fact that

---

[2] Although the 2004 Form is irrelevant to the decision not to settle in 2010, this Form clearly shows that APAC allocated only 10% of the chance of loss to the insured, TSC. (Pltf. Ex. 20A.)

5

Dr. Hasson was no longer in the case, the reserve was set at TSC's policy limit. (Tr. 189:1-22 (Oblak)). Mr. Reed, APAC's former claims litigation manager, also confirmed that the reserve form he and Ms. Oblak used in 2010 to reset APAC's reserve amount (referring to the copy at Dfdt. Ex. 185) "does not take into account chance of loss … *it's simply a damages assessment.*" (Tr. 546:6-16 (emphasis added).) As Mr. Reed made clear, "*Liability is not assessed on this form.*" (Tr. 546:16 (emphasis added).)

Accordingly, APAC increased its reserve on the *Tate* case after remand because it had, by then, adopted a more conservative methodology for setting reserves, and TSC was then the sole defendant. The reserve increase had nothing to do with APAC's assessment of the reasonable probability of a finding *of liability* against TSC. No witness has offered a contrary view of APAC's 2010 reserve setting and Reserve Evaluation Worksheet.

The evidence before this jury, therefore, is that TSC was objectively more likely than not *to win* the *Tate* case when Ms. Tate demanded settlement. For example, the jury heard that:

- "There was nothing that would warrant us settling the case…. The case only got stronger as the case progressed." (Tr. 137:16-20 (Oblak).)

- "[Ms. Tate's] case was very, very weak…. [she] had a lot of issues and problems in it." (Tr. 543:9-13 (Reed).)

- "75 percent for me is a – is a very high estimate of our chances of actually prevailing." (Tr. 556:3-8 (Reed).)

- "[Mr. Smith] thought there was a 90 percent chance of winning." (Tr. 559:13-21; *see also* Tr. 563:19-24 (Reed).)

- "I relied on the information and advice that Shelly [Oblak] was giving me and also that Jennifer [Lowis] was giving me that this case was frivolous." (Tr. 751:2-5 (Griffiths).)

- "I had been told by Jennifer [Lowis] and Shelly [Oblak] that the case was defensible consistently, yes." (Tr. 901:22-25; *see also* Tr. 887:17-19 (Griffiths).)

- "I was told from my clinical staff that we did not do anything wrong. And I believe them, yes." (Tr. 844:23-845:4; *see also* Tr. 846:1-6 (Griffiths).)

6

- "[T]his is the tone of the conversations that we had. The case was frivolous…." (Tr. 750:17-18 (Griffiths).)

- "[Ms. Griffiths] believed that it was a frivolous case and that it should be tried." (Tr. 185:8-11 (Oblak).)

- APAC's Trial Committee concluded "[t]hat it was a very defensible case, and it should be tried." (Tr. 386:23-387:2 (Shutack).)

This jury also heard that TSC lost the *Tate* case because of a problematic and unexpected jury instruction proposed for the first time and given *at trial* when it is undisputed that no settlement demand was pending. (Tr. 184:1-13 (Oblak).)

In its summary-judgment ruling, this Court also noted that APAC had labeled the *Tate* case as "high exposure." (Doc. 304 at 6.) The uncontroverted evidence, however, is that a "high exposure" designation related solely to a case's potential damages. (*See, e.g.*, Tr. 63:25-64:2 (Oblak), Tr. 362:23-25 (Shutack), Tr. 505:13-19 (Reed).) There is no evidence that "high exposure" reflected in any way the probability of a finding of liability against the insured.

At bottom, this jury has no evidence from which it could reasonably conclude that, at the times APAC had an opportunity to settle the *Tate* case, TSC was more likely than not to lose. Thus, TSC has failed to establish that APAC had a duty to settle that it breached in bad faith.

Lest there be doubt, TSC improperly relies on *O'Neill v. Gallant Insurance Co.*, 769 N.E.2d 100 (Ill. App. 2002), to argue that contrary legal standards and a six-factor test apply. Though decided shortly after *Haddick*, the *O'Neill* court never cited *Haddick*, and relied instead on inconsistent, pre-*Haddick* case law. In any event, there was no question in *O'Neill* that a duty to settle had been triggered. Gallant was "[c]onfronted with a case of *obvious liability*" against its insured. *Id.* at 104 (emphasis added). Indeed, "[t]he odds of a jury rejecting Mrs. O'Neill's claim [against the insured] were *astronomical*… [and] *everyone* predicted that [the insured] would

7

lose." *Id*. at 108 (emphasis added). Here, Ms. Tate's claim against TSC was exactly the opposite – *everyone* predicted that TSC would prevail, so no obligation to settle ever arose.

Likewise, TSC improperly relies on the Illinois Pattern Jury Instructions to argue for contrary legal standards. The *Hana* court confirmed that neither § 710.02 nor § 710.03 "fairly and accurately reflects the current state of the law," and that "nonpattern jury instructions should be crafted" in failure-to-settle cases. *Hana*, ¶ 37. The *Hana* court further confirmed that any such nonpattern instructions "*must* reflect the holdings in *Haddick* and *Powell*." *Id*. (emphasis added). As such, TSC simply cannot avoid those holdings here.

**B.** *TSC overstates the scope of its bad-faith claim and much of its evidence is irrelevant.*

As this Court has recognized, "[a]n insurance company has a duty to act in good faith *when responding to settlement offers*." (Doc. 304 at 5 (emphasis added).) Under the *Haddick*, *Powell*, and *Hana* line of cases, APAC cannot be held liable based on generalized notions of "good faith." Rather, APAC can be held liable for failing to settle *only* if TSC proves all three elements of the cause of action. But, again, there is no evidence that it was ever more likely than not that the *Tate* case would be lost. The purported theories of "bad faith" that TSC appears to be pursuing – largely based on arguments that TSC was not fully informed and that APAC improperly failed to disclose its reserving and reinsurance information, a meeting of New Mexico defense counsel, and supposed "conflicts of interests" – are not cognizable common-law bad-faith claims and, therefore, are simply irrelevant.

As the Illinois Supreme Court has explained:

> Unlike an action in fraud, a bad-faith action involves insurer misconduct that is similar to unreasonable and vexatious misconduct. *This court, however, has never recognized such a tort*…. A [common-law] bad-faith action would encourage plaintiffs to sue in tort, and not breach of contract, to avoid suit limitation clauses and the cap on the statutory remedy [under § 155].

8

*Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 902-03, 904 (Ill. 1996) (emphasis added). In other words, "an insurer's conduct *may* give rise to both a breach of contract action and a separate and independent tort action [such as fraud]. Mere allegations of bad faith or unreasonable and vexatious conduct, without more, however, *do not constitute such a tort*." *Id*. at 904 (emphasis added). Rather, since its enactment in 1937, a § 155 claim provides the exclusive, extra-contractual remedy for such allegations. *Id*.; *see Burress-Taylor v. Am. Sec. Ins. Co.*, 2012 IL App (1st) 110554, ¶ 28, 980 N.E.2d 679, 688 ("mere allegations of bad faith or unreasonable and vexatious conduct … are preempted by section 155"); *see also* Ill. Pattern Jury Instr. – Civil § 710.00 ("Claims against liability insurers for bad faith refusal to settle are not preempted by the Illinois Insurance Code. Therefore, the instructions in this chapter are limited to bad faith claims against liability insurers for refusal to settle.").

The *Cramer* Court clarified, however, that "the contractual covenant of good faith and fair dealing" has been used in Illinois to establish an independent tort involving the "duty to settle." *Cramer*, 675 N.E.2d at 903. The Court distinguished this from other "bad faith" claims:

> The "duty to settle" arises because the policyholder has relinquished defense of the suit to the insurer. The policyholder depends upon the insurer to conduct the defense properly. In these cases, the policyholder has no contractual remedy because the policy does not specifically define the liability insurer's duty *when responding to settlement offers*. The duty was imposed to deal with *the specific problem of claim settlement abuses* by liability insurers where the policyholder has no contractual remedy.

*Id*. (emphasis added). Correspondingly, "[w]hen an insurer breaches *this duty* by refusing to settle, the insurer may be liable for the full amount of a judgment against the policyholder, regardless of policy limits." *Id*. (emphasis added). The Illinois Supreme Court later reiterated *Cramer*'s limited exception to its rule against common-law, bad-faith claims:

> In that case, this court refused to recognize an independent action in tort for breach of an implied covenant of good faith and fair dealing, stating that the

9

claim would be proper *only in the narrow context of cases involving an insurer's obligation to settle* with a third party who has sued the policyholder.

*Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1131 (Ill. 2001) (emphasis added).

Hence, because of the longstanding § 155 statutory claim and the extra-contractual remedies it provides (that are not part of this case), the *only* common-law bad-faith claim Illinois courts have ever recognized is for breach of the "duty to settle," and under the *Haddick*, *Powell*, and *Hana* standards, TSC has failed to present sufficient evidence to trigger the duty.[3]

## II. There is no evidence of the outrageous conduct required for punitive damages.

TSC cannot recover punitive damages without a meritorious tort claim. *E.g.*, *U.S. v. Slurry Sys., Inc.*, 804 F.3d 889, 892 (7th Cir. 2015). But even if TSC had presented enough facts to go to the jury on its failure-to-settle claim, the Court should enter judgment as a matter of law on TSC's prayer for punitive damages in Count II. TSC's evidence falls far short of the high burden for punitive damages. These are "penal in nature" and "not favored in the law," and "courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Slovinski v. Elliot*, 927 N.E.2d 1221, 1225 (Ill. 2010). "[M]ere inadvertence, mistake, errors of judgment" – which constitute "ordinary negligence" – are insufficient. *Tucker v. Illinois Power Co.*, 597 N.E.2d 220, 231 (Ill. App. 1992). Rather, TSC must prove conduct "involving *some element of outrage* similar to that usually found in crime." *Loitz v. Remington Arms Co.*, 563 N.E.2d 397, 402 (1990). There must be "*utter indifference* and *reckless disregard*" for TSC's welfare. *O'Neill v. Gallant Ins. Co.*, 769 N.E.2d 100, 106-08 (Ill. App. 2002).

Here, all of the evidence – from TSC's and APAC's witnesses – is that Ms. Griffiths, TSC's clinical staff, defense counsel, and APAC all believed that the *Tate* case was highly

---

[3] Moreover, even if TSC had a § 155 claim, Ms. Griffiths – TSC's only representative to testify – never said that, but for APAC's failure to advise her fully, TSC would have accepted Ms. Tate's pretrial settlement demand and paid $1 million with its own funds to settle. TSC therefore lacks critical evidence of causation even on this unpled theory.

defensible, if not frivolous, as to liability and causation. (*See, e.g.*, Tr. 137:16-20, 386:23-387:2, 543:9-13, 556:3-8, 559:13-21, 563:19-24, 750:17-18, 751:2-5, 778:6-7.) Ms. Griffiths repeatedly expressly her opinions of the defensibility of the *Tate* case in writing. (*See, e.g.*, Pltf. Exs. 158, 187; Dfdt. Exs. 42, 43, 47, 55.) As such, TSC can show, at most, that APAC was negligent (along with Ms. Griffiths and defense counsel) in its assessment that the *Tate* case was defensible. Moreover, TSC has offered no evidence that, in declining to settle, APAC recklessly disregarded the risk of a verdict in excess of TSC's policy limit; rather, APAC and TSC's counsel were aware and repeatedly warned TSC of that very risk. (*See, e.g.*, Pltf. Exs. 13-16, 19, 161, 187; Dfdt. Ex. 47.) Ms. Griffiths also acknowledged her awareness of this risk several times leading up to trial. (*See, e.g.*, Dfdt. Ex. 28 ("I have been amazed by [claims reps'] lack of understanding of the underlying legal arguments and by how easily they are intimidated by the damage"); Dfdt. Ex. 43 at 2 ("I know that insurance companies make their decisions based on economics, but I really would not feel right settling this case"); Dfdt. Ex. 47 ("That said, it is cook county and we all know we're rolling the dice every time we enter a courtroom.").

Nor does TSC have any evidence of a pattern and practice – the so-called "concrete plan" – to improperly push meritorious cases to trial. While the *Tate* case was pending, APAC handled thousands of claims. (Tr. 541:20-542:1 (Reed).) Yet TSC has presented to the jury information about the merits of only one – the *Tate* case.[4] While TSC has elicited testimony that excess verdicts were entered against APAC's insureds in Illinois in two other cases between 2006 and 2011 (Tr. 482:15-483:2 (Grant)), the jury only knows that a settlement demand was made in those cases, and that the verdicts were in excess of the insureds' policy limits. (Tr. 483:3-484:5 (Grant).) The jury lacks critical information about the merits underlying those two cases and if

---

[4] The jury has also heard about the *Harris* case involving one of TSC's affiliates insured by APAC. Contrary to any "concrete plan" to try all cases, however, Ms. Griffiths knew that the *Harris* case would be (and in fact was) settled. (Tr. 959:6-960:4 (Griffiths).)

11

the insureds ever consented to settlement. The mere fact of the verdicts tells the jury nothing about the propriety of APAC's decision to try those cases. Indeed, APAC was "winning about 89% of the cases that it was taking to trial in Illinois," and that "most of the cases" APAC was winning at that time involved "severe injuries like those that [were] alleged by Ms. Tate." (Tr. 382:6-13 (Shutack).) Consequently, those two excess verdicts constitute outliers that cannot support a reasonable finding of reprehensible misconduct – in the form of a "concrete plan" or otherwise – as is required for an award of punitive damages.

**III.   There is no evidence APAC encouraged its defense counsel to breach a duty to TSC.**

Illinois courts have adopted the Restatement's definition of in-concert liability. *Carollo v. Al Warren Oil Co.*, 820 N.E.2d 994, 1008-09 (Ill. App. 2004). The Restatement provides for APAC to be liable for alleged harm resulting from defense counsels' supposedly tortious conduct only if APAC:

> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979). "The first and third examples involve instances where the party's own actions constituted a tort." *Winters v. Wangler*, 898 N.E.2d 776, 783 (Ill. App. 2008) (Justice Cook, specially concurring). Consequently, any theory of liability based on subsections (a) or (c) of the Restatement, like TSC's prayer for punitive damages, falls with TSC's untenable failure-to-settle claim.

"The second [Restatement] example involves a case where the person did not commit an act that would be a tort, but that person gave substantial assistance or encouragement to another

party whose actions constituted a tort and that person knew that the other person's conduct constituted a tort." *Id*. TSC has provided no evidence from which the jury could reasonably find that APAC knowingly and substantially assisted or encouraged Lowis & Gellen to breach any duty to TSC.[5] Indeed, TSC never established that any of APAC's employees working on the *Tate* case could even define defense counsels' professional duties to TSC such that those employees could knowingly assist in a breach of them.

In addition, APAC's defense counsel guidelines contained that caveat that "[n]othing in these guidelines is intended to infringe upon that attorney-client relationship [between insured and defense counsel] in any manner." (Pltf. Ex. 11 at 2.) Those guidelines also specifically instructed that, "[i]f at any time the retained attorney perceives any conflict between representation of the Insured and adherence to these guidelines, the conflict should be immediately brought to the attention of the Insured and the Company so that appropriate steps may be taken to resolve the conflict." (*Id*.) The guidelines further provided that "[d]efense counsel shall copy the Insured on all correspondence sent to the Company including the quarterly billing statements." (*Id*.) As such, APAC's policy sought only to protect defense counsels' professional responsibilities and foster communication.

Nor did any APAC witness testify that they had instructed Illinois defense counsel to refrain from discussing settlement or the risks of trial with any insureds, much less with TSC.[6] (*See, e.g.*, Tr. 255:12-256:1 (Shutack); Tr. 457:11-13 (Grant); Tr. 564:9-18 (Reed).) As Ms. Shutack put it, "settlement discussions can occur at any time with anybody." (Tr. 250:18-20.)

---

[5] The stipulation regarding Lynn Sharp indicated that Ms. Shutack told him and other New Mexico defense counsel not to be involved in settlement discussions with APAC insureds. (Tr. 729:17-730:3.) That stipulation also indicated, however, that Mr. Sharp has no knowledge of what was told to any attorneys in Illinois. (Tr. 730:3-6.)

[6] Again, Mr. Sharp's stipulated testimony provides no support for TSC's concert-of-action theory because he has no knowledge of what was told to any Illinois attorneys. (Tr. 730:3-6.) He therefore cannot establish that APAC somehow acted "in concert" with Lowis & Gellen to TSC's detriment.

Moreover, APAC does not cause counsel to violate any duties by reserving to itself the role of negotiating settlements. In Illinois, "[t]he authority of an attorney to represent a client in litigation is separate from the authority to compromise or settle a lawsuit." *Blutcher v. EHS Trinity Hosp.*, 746 N.E.2d 863, 868 (Ill. App. 2001). The Illinois Supreme Court "has long held that counsel must possess express consent or authorization to compromise or settle a case." *Webster v. Hartman*, 749 N.E.2d 958, 963 n.1 (Ill. 2001). Put another way, the "client has a right to negotiate a settlement on his own behalf." *Knell v. State Farm Mut. Auto. Ins. Co.*, 32 Ill. App. 3d 491, 496, 336 N.E.2d 568, 572 (1975). That role was simply not something that defense counsel was ethically required to do.

Lastly, TSC cannot avoid these standards for in-concert liability merely because of the attorney-client relationship between APAC and defense counsel. For example, in *Horwitz v. Holabird & Root*, 816 N.E.2d 272, 279 (Ill. 2004), the Court reasoned that attorneys "possess such considerable autonomy over the details and manner of performing their work that they are presumptively independent contractors for purposes of imposing vicarious liability." Illinois courts also have "held on multiple occasions that requiring an independent contractor to follow certain policies and procedures does not, standing alone, constitute sufficient control to create an agency relationship." *Magnini v. Centegra Health Sys.*, 2015 IL App (1st) 133451, ¶ 33, 34 N.E.3d 1115, 1123 (hospital not vicariously liable for physicians' malpractice even though physicians were required to adhere to hospital's bylaws). APAC's defense counsel guidelines therefore do not create an agency relationship, and TSC has not offered any testimony by which the jury could find an agency relationship between APAC and Lowis & Gellen.

At bottom, TSC has failed to create a factual question as to whether Ms. Lowis, Ms. Berger, or Mr. Smith ever breached a duty that caused TSC any injury, and the notion that APAC

knowingly acted "in concert" with these attorneys to encourage such a breach is even more untenable. TSC's attempt to impute in-concert liability to APAC therefore lacks any evidentiary or legal foundation, and it should not be presented to the jury.

## CONCLUSION

For the foregoing reasons, APAC respectfully requests that the Court enter judgment as a matter of law in APAC's favor and against TSC as to this case in its entirety. Alternatively, APAC asks that the Court enter judgment as to Counts II and III of TSC's Complaint.

Respectfully submitted on behalf of Defendants,

American Physicians Assurance Corporation, Inc.
and American Physicians Capital, Inc.,

By: /s/ Jon T. Neumann
     One of the Attorneys for Defendants

Jon T. Neumann (admitted *pro hac vice*)
jneumann@steptoe.com
Floyd P. Bienstock (admitted *pro hac vice*)
fbienstock@steptoe.com
Steptoe & Johnson LLP
201 E. Washington St., Suite 1600
Phoenix, AZ 85004
Telephone: (602) 257-5220

James J. Stamos (ARDC #03128244)
jstamos@stamostrucco.com
Benjamin F. Klimek
bklimek@stamostrucco.com
Stamos & Trucco LLP
One E. Wacker Drive 3rd Flr.
Chicago, Illinois 60601
Telephone: (312) 630-7979
Facsimile: (312) 630-1183

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he caused a copy of the foregoing Defendants' Motion for Judgment as a Matter of Law to be served upon:

> George W. Spellmire
> Michael C. Bruck
> Jessica L. Dagley
> SPELLMIRE BRUCK, LLP
> One East Wacker Drive, Suite 2350
> Chicago, Illinois 60601

Via in person delivery and electronic filing on June 26, 2018.

/s/ Jon T. Neumann